# EXHIBIT 8

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHANIE JONES, JONESWORKS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>JENNIFER ABEL, MELISSA NATHAN, JUSTIN BALDONI, WAYFARER STUDIOS LLC, and JOHN DOES 1-10,<br><br>Defendants. | Civ. Action No. 1:25-cv-00779-LJL<br>rel. 1:24-cv-10049-LJL<br>(Consolidated for pretrial purposes with 1:25-cv-00449-LJL)<br><br>**DEFENDANT JENNIFER ABEL'S AMENDED ANSWER TO COMPLAINT, COUNTERCLAIMS, AND JURY TRIAL DEMAND** |

Defendant Jennifer Abel ("Abel" or "Defendant"), by and through her undersigned counsel, hereby answers, for herself alone and no others, the Complaint of Plaintiffs Stephanie Jones ("Jones") and Jonesworks LLC ("Jonesworks") (together with Jones, "Plaintiffs") as follows:

## THE COMPLAINT'S ALLEGATIONS

1. Answering the allegations in paragraph 1 of the Complaint, Defendant denies such allegations.

2. Answering the allegations in paragraph 2 of the Complaint, Defendant admits that Jones is engaged in the field of public relations; and that Jonesworks has represented Justin Baldoni ("Baldoni") and Wayfarer Studios LLC ("Wayfarer"). As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

3. Answering the allegations in paragraph 3 of the Complaint, Defendant admits that Baldoni produced, directed, and co-starred in the film *It Ends With Us* (the "Film"); that Defendant oversaw the Baldoni and Wayfarer accounts while employed at Jonesworks; and that Defendant

1

recommended the engagement of Melissa Nathan ("Nathan") for crisis public relations. As to all remaining allegations, Defendant denies such allegations.

4.       Answering the allegations in paragraph 4 of the Complaint, Defendant admits the allegation that she received Nathan's communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

5.       Answering the allegations in paragraph 5 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

6.       Answering the allegations in paragraph 6 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

7.       Answering the allegations in paragraph 7 of the Complaint, Defendant admits that she and Nathan were working to protect Baldoni from negative press attention; and that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

8.       Answering the allegations in paragraph 8 of the Complaint, Defendant admits the allegation that she spoke with Katie Warren ("Warren") between July 30, 2024, and August 12, 2024; and that she sent communications containing the text set forth in that paragraph. Defendant

denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

9.      Answering the allegations in paragraph 9 of the Complaint, Defendant admits the allegation that she received Nathan's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

10.      Answering the allegations in paragraph 10 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

11.      Answering the allegations in paragraph 11 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

12.      Answering the allegations in paragraph 12 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

13.      Answering the allegations in paragraph 13 of the Complaint, Defendant denies such allegations.

14.      Answering the allegations in paragraph 14 of the Complaint, Defendant denies such allegations.

15.     Answering the allegations in paragraph 15 of the Complaint, Defendant states that no response is required because the allegations assert a legal conclusion, to the extent Plaintiffs allege that Defendant has defamed Jones. As to all remaining allegations, Defendant denies such allegations.

16.     Answering the allegations in paragraph 16 of the Complaint, Defendant denies such allegations.

17.     Answering the allegations in paragraph 17 of the Complaint, Defendant admits the allegation that Jonesworks is a Delaware limited liability company; and that it was founded in and has its principal place of business in New York, New York. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

18.     Answering the allegations in paragraph 18 of the Complaint, Defendant admits such allegations.

19.     Answering the allegations in paragraph 19 of the Complaint, Defendant admits the allegation that she resides in Beverly Hills, California; and that she was employed by Jonesworks from approximately July 2020 to August 2024. To the extent Plaintiffs allege that Abel was terminated for cause by Jonesworks, no response is required because the allegation asserts a legal conclusion. As to all remaining allegations, Defendant denies such allegations.

20.     Answering the allegations in paragraph 20 of the Complaint, Defendant admits the allegation that Nathan offers crisis management and communications services. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

21.     Answering the allegations in paragraph 21 of the Complaint, Defendant admits the allegation that Baldoni is a professional actor and director, and is a co-founder and co-chairman of Wayfarer; and that Baldoni was the director and co-star of the Film. Defendant denies that Baldoni was a producer of the Film and, as to all remaining allegations, lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

22.     Answering the allegations in paragraph 22 of the Complaint, Defendant admits such allegations.

23.     Answering the allegations in paragraph 23 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations except to the extent they merely state a legal conclusion and require no response.

24.     Answering the allegations in paragraph 24 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

25.     Answering the allegations in paragraph 25 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

26.     Answering the allegations in paragraph 26 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

27.     Answering the allegations in paragraph 27 of the Complaint, Defendant admits the allegation that Jones is engaged in the field of public relations and that Jones is the founder, president, and owner of Jonesworks. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

28.     Answering the allegations in paragraph 28 of the Complaint, Defendant admits such allegations.

29.     Answering the allegations in paragraph 29 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations. Defendant submits that the document speaks for itself and denies that the Abel NDA and its contents are characterized accurately in the Complaint.

30.     Answering the allegations in paragraph 30 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations. Defendant submits that the document speaks for itself and denies that the Employment Agreement and its contents are characterized accurately in the Complaint.

31.     Answering the allegations in paragraph 31 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations. Defendant submits that the document speaks for itself and denies that the Employment Agreement and its contents are characterized accurately in the Complaint.

32.     Answering the allegations in paragraph 32 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

33.    Answering the allegations in paragraph 33 of the Complaint, Defendant admits such allegations.

34.    Answering the allegations in paragraph 34 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

35.    Answering the allegations in paragraph 35 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

36.    Answering the allegations in paragraph 36 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

37.    Answering the allegations in paragraph 37 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

38.    Answering the allegations in paragraph 38 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

39.    Answering the allegations in paragraph 39 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations

in the paragraph require a response, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

40.     Answering the allegations in paragraph 40 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

41.     Answering the allegations in paragraph 41 of the Complaint, Defendant admits that she worked on the Baldoni and Wayfarer accounts while employed at Jonesworks; and that she worked closely with Jamey Heath ("Heath"), who currently serves as Wayfarer's CEO. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

42.     Answering the allegations in paragraph 42 of the Complaint, Defendant admits such allegations.

43.     Answering the allegations in paragraph 43 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

44.     Answering the allegations in paragraph 44 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

45.     Answering the allegations in paragraph 45 of the Complaint, Defendant admits such allegations.

46.     Answering the allegations in paragraph 46 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations.

47.     Answering the allegations in paragraph 47 of the Complaint, Defendant admits that Baldoni began production on the film adaptation of the Film in 2023; and that Baldoni was the director and male lead of the film. As to all remaining allegations, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

48.    Answering the allegations in paragraph 48 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

49.    Answering the allegations in paragraph 49 of the Complaint, Defendant admits that the Film was released in August 2024; and that the *Daily Mail* published the article cited in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

50.    Answering the allegations in paragraph 50 of the Complaint, Defendant denies such allegations.

51.    Answering the allegations in paragraph 51 of the Complaint, Defendant denies such allegations.

52.    Answering the allegations in paragraph 52 of the Complaint, Defendant admits the allegation that Baldoni was provided with the confidential scenario planning memorandum set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the document and its context are characterized accurately in the Complaint.

53.    Answering the allegations in paragraph 53 of the Complaint, Defendant denies such allegations, and specifically denies that the document and its context are characterized accurately in the Complaint.

54.    Answering the allegations in paragraph 54 of the Complaint, Defendant admits the allegation that she sent a communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

55.    Answering the allegations in paragraph 55 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph.

Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

56.     Answering the allegations in paragraph 56 of the Complaint, Defendant denies such allegations.

57.     Answering the allegations in paragraph 57 of the Complaint, Defendant denies such allegations.

58.     Answering the allegations in paragraph 58 of the Complaint, Defendant denies such allegations.

59.     Answering the allegations in paragraph 59 of the Complaint, Defendant admits the allegation that she received Tera Hanks's ("Hanks") communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

60.     Answering the allegations in paragraph 60 of the Complaint, Defendant admits the allegation that she received Heath's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

61.     Answering the allegations in paragraph 61 of the Complaint, Defendant denies such allegations.

62.     Answering the allegations in paragraph 62 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

10

63.     Answering the allegations in paragraph 63 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

64.     Answering the allegations in paragraph 64 of the Complaint, Defendant admits the allegation that she received Nathan's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

65.     Answering the allegations in paragraph 65 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

66.     Answering the allegations in paragraph 66 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

67.     Answering the allegations in paragraph 67 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

68.     Answering the allegations in paragraph 68 of the Complaint, Defendant admits that the *Daily Mail* published the article cited in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

69.    Answering the allegations in paragraph 69 of the Complaint, Defendant admits the allegation that she received Josh Greenstein's ("Greenstein") communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

70.    Answering the allegations in paragraph 70 of the Complaint, Defendant admits that she denied being the source. Defendant denies all of the remaining allegations in this paragraph.

71.    Answering the allegations in paragraph 71 of the Complaint, Defendant admits the allegation that she received Heath's communication containing the text set forth in that paragraph. as set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

72.    Answering the allegations in paragraph 72 of the Complaint, Defendant admits the allegation that she received Heath's and Jones's communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

73.    Answering the allegations in paragraph 73 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

74.    Answering the allegations in paragraph 74 of the Complaint, Defendant admits that the *Daily Mail* published the article cited in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

75.    Answering the allegations in paragraph 75 of the Complaint, Defendant admits the allegation that she received Heath's communication containing the text set forth in that paragraph.

Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

76.     Answering the allegations in paragraph 76 of the Complaint, Defendant denies such allegations.

77.     Answering the allegations in paragraph 77 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

78.     Answering the allegations in paragraph 78 of the Complaint, Defendant admits the allegation that she spoke with Warren between July 30, 2024, and August 12, 2024. Defendant denies all of the remaining allegations in this paragraph.

79.     Answering the allegations in paragraph 79 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

80.     Answering the allegations in paragraph 80 of the Complaint, Defendant denies encouraging the client to terminate their contract with Jones or intentionally interfering with Jones' relationship with the client. As to the remaining allegations, Defendant lacks knowledge or information sufficient to form a belief about the truth of such allegations.

81.     Answering the allegations in paragraph 81 of the Complaint, Defendant admits the allegation that she sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

82.    Answering the allegations in paragraph 82 of the Complaint, Defendant admits the allegation that she received Warren's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

83.    Answering the allegations in paragraph 83 of the Complaint, Defendant admits such allegations.

84.    Answering the allegations in paragraph 84 of the Complaint, Defendant admits the allegation that she received Nathan's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that communication and its context are characterized accurately in the Complaint.

85.    Answering the allegations in paragraph 85 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

86.    Answering the allegations in paragraph 86 of the Complaint, Defendant admits the allegation that she received Warren's communication containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communication and its context are characterized accurately in the Complaint.

87.    Answering the allegations in paragraph 87 of the Complaint, Defendant admits that she texted a link to Nathan to *Business Insider* article referenced in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

88.    Answering the allegations in paragraph 88 of the Complaint, Defendant admits that *Business Insider* published the article cited in that paragraph. As to all remaining allegations,

Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

89.     Answering the allegations in paragraph 89 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

90.     Answering the allegations in paragraph 90 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

91.     Answering the allegations in paragraph 91 of the Complaint, Defendant admits that *Business Insider* published the article cited in that paragraph. Defendant denies all of the remaining allegations in this paragraph.

92.     Answering the allegations in paragraph 92 of the Complaint, Defendant denies that she acted in concert with John Does 1-10. As to the remaining allegations, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

93.     Answering the allegations in paragraph 93 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

94.     Answering the allegations in paragraph 94 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

95.     Answering the allegations in paragraph 95 of the Complaint, Defendant admits that she filed articles of organization with the State of California, Office of the Secretary of State, on or about July 19, 2024. Defendant denies all of the remaining allegations in the paragraph.

96.     Answering the allegations in paragraph 96 of the Complaint, Defendant admits that she made a jennifer@rwacommunications.com email account but denies all of the remaining allegations in the paragraph.

97.     Answering the allegations in paragraph 97 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

98.     Answering the allegations in paragraph 98 of the Complaint, Defendant admits that Jonesworks disabled her access to Jonesworks' servers; and that she and Alicia Jessop ("Jessop") sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

99.     Answering the allegations in paragraph 99 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

100.     Answering the allegations in paragraph 100 of the Complaint, Defendant admits that she was terminated by Jonesworks on or about August 21, 2024. Defendant denies all of the remaining allegations in the paragraph.

101.     Answering the allegations in paragraph 101 of the Complaint, Defendant denies such allegations.

102.     Answering the allegations in paragraph 102 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

103.    Answering the allegations in paragraph 103 of the Complaint, Defendant admits the allegation that she and Nathan sent communications containing the text set forth in that paragraph. Defendant denies all of the remaining allegations in the paragraph, and specifically denies that the communications and their context are characterized accurately in the Complaint.

104.    Answering the allegations in paragraph 104 of the Complaint, Defendant denies such allegations.

105.    Answering the allegations in paragraph 105 of the Complaint, Defendant denies such allegations.

106.    Answering the allegations in paragraph 106 of the Complaint, Defendant lacks knowledge or information sufficient to form a belief as to the truth of such allegations.

107.    Answering the allegations in paragraph 107 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

108.    Answering the allegations in paragraph 108 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

109.    Answering the allegations in paragraph 109 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

110.    Answering the allegations in paragraph 110 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

111.    Answering the allegations in paragraph 111 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

112.    Answering the allegations in paragraph 112 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

113.    Answering the allegations in paragraph 113 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

114.    Answering the allegations in paragraph 114 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

115.    Answering the allegations in paragraph 115 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

116.    Answering the allegations in paragraph 116 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

117.    Answering the allegations in paragraph 117 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

118.    Answering the allegations in paragraph 118 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

119.    Answering the allegations in paragraph 119 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

120.    Answering the allegations in paragraph 120 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

121.    Answering the allegations in paragraph 121 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

122.    Answering the allegations in paragraph 122 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

123.    Answering the allegations in paragraph 123 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

124.    Answering the allegations in paragraph 124 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

125.    Answering the allegations in paragraph 125 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

126.    Answering the allegations in paragraph 126 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

127.    Answering the allegations in paragraph 127 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

128.    Answering the allegations in paragraph 128 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

129.    Answering the allegations in paragraph 129 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

130.    Answering the allegations in paragraph 130 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

131.    Answering the allegations in paragraph 131 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

132.    Answering the allegations in paragraph 132 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

133.    Answering the allegations in paragraph 133 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

134.    Answering the allegations in paragraph 134 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

135.    Answering the allegations in paragraph 135 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

136.    Answering the allegations in paragraph 136 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

137.    Answering the allegations in paragraph 137 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

138.    Answering the allegations in paragraph 138 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

139.    Answering the allegations in paragraph 139 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

140.    Answering the allegations in paragraph 140 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

141.    Answering the allegations in paragraph 141 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

142.    Answering the allegations in paragraph 142 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

143.   Answering the allegations in paragraph 143 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

144.   Answering the allegations in paragraph 144 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

145.   Answering the allegations in paragraph 145 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

146.   Answering the allegations in paragraph 146 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

147.   Answering the allegations in paragraph 147 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

148.   Answering the allegations in paragraph 148 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

149.   Answering the allegations in paragraph 149 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

150.   Answering the allegations in paragraph 150 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

151.    Answering the allegations in paragraph 151 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

152.    Answering the allegations in paragraph 152 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

153.    Answering the allegations in paragraph 153 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

154.    Answering the allegations in paragraph 154 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

155.    Answering the allegations in paragraph 155 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

156.    Answering the allegations in paragraph 156 of the Complaint, Defendant incorporates by reference her responses in the foregoing paragraphs.

157.    Answering the allegations in paragraph 157 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

158.    Answering the allegations in paragraph 158 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

159.    Answering the allegations in paragraph 159 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

160.    Answering the allegations in paragraph 160 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

161.    Answering the allegations in paragraph 161 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

162.    Answering the allegations in paragraph 162 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

163.    Answering the allegations in paragraph 163 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

164.    Answering the allegations in paragraph 164 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

165.    Answering the allegations in paragraph 165 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

166.    Answering the allegations in paragraph 166 of the Complaint, the allegations require no response because they merely state a legal conclusion. To the extent that any of the allegations in the paragraph require a response, Defendant denies such allegations.

167.    Answering paragraph 167 of the Complaint, the paragraph requires no response as it states relief sought and is not an allegation. To the extent the paragraph requires a response, Defendant denies.

168.    Answering paragraph 168 of the Complaint, the paragraph requires no response as it states relief sought and is not an allegation. To the extent the paragraph requires a response, Defendant denies.

**AFFIRMATIVE AND OTHER DEFENSES**

By alleging the following affirmative and other defenses, Defendant is not in any way agreeing or conceding that she has the burden of proof or burden of persuasion on any of these issues. As separate and distinct defenses to Plaintiffs' Complaint, and each purported cause of action contained therein, Defendant alleges as follows:

**FIRST DEFENSE**

169.    The Complaint, and each claim alleged therein, fails to state facts sufficient to constitute any claim for relief against Defendant.

**SECOND DEFENSE**

170.    The Complaint, and each claim alleged therein, is barred as Plaintiffs lack standing to sue.

**THIRD DEFENSE**

171.    The Complaint, and each claim alleged therein, is barred as Plaintiffs have waived their claims.

**FOURTH DEFENSE**

172.    The Complaint, and each claim alleged therein, is barred as Plaintiffs are estopped from asserting their claims.

**FIFTH DEFENSE**

173.    The Complaint, and each claim alleged therein, is barred as Plaintiffs acted and continues to act with unclean hands.

**SIXTH DEFENSE**

174.    The Complaint, and each claim alleged therein, is barred as Plaintiffs have not been damaged in any way or at all as a result of any alleged acts or omissions of Defendant.

**SEVENTH DEFENSE**

175.    The Complaint, and each claim alleged therein, is barred in whole or in part by the First Amendment of the Constitution of the United States of America.

**EIGHTH DEFENSE**

176.    The Complaint, and each claim alleged therein, is barred by reason of Plaintiffs' consent.

**NINTH DEFENSE**

177.    The Complaint, and each claim alleged therein, is barred as Plaintiffs have failed to undertake reasonable measures to mitigate the damages they claim to have incurred. Any recovery by Plaintiffs must be diminished to the extent that any alleged damages could have been avoided if such measures had been undertaken.

**TENTH DEFENSE**

178.    Defendant is informed and believes, and on that basis alleges, that Plaintiffs would be unjustly enriched if recovery were to be had on this Complaint.

**ELEVENTH DEFENSE**

179.    Plaintiffs have not been damaged in any amount alleged, or in any amount whatsoever, and are not entitled to any general, compensatory, statutory, punitive, or other damages or any other relief as a result of any of the allegations set forth in the Complaint.

**TWELFTH DEFENSE**

180.    The acts and/or omissions of Plaintiffs excused any alleged act or alleged failure to act on the part of Defendant.

**THIRTEENTH DEFENSE**

181.    If Defendant had any alleged obligations or legal dues, which Defendant hereby expressly denies, Defendant has appropriately, completely, and fully performed and discharged any alleged obligations and any alleged legal duties arising out of the matters alleged in the Complaint.

**FOURTEENTH DEFENSE**

182.    The damages and injuries, if any, suffered by Plaintiffs were directly and proximately caused solely by the acts or omissions of individuals or entities other than Defendant. The acts and omissions of such other individuals or entities are superseding or intervening causes of loss or damages, if any, suffered by Plaintiffs. As a consequence thereof, Plaintiffs are barred from recovery against Defendant herein.

**FIFTEENTH DEFENSE**

183.    The damages and injuries, if any, suffered by Plaintiffs were directly and proximately caused solely by the reckless, negligent, and wrongful conduct of individuals or entities other than Defendant. As a consequence thereof, Plaintiffs are barred from recovery herein.

**SIXTEENTH DEFENSE**

27

184.    The damages and injuries, if any, suffered by Plaintiffs were directly and proximately caused solely by the intentional misconduct of individuals or entities other than Defendant. As a consequence thereof, Plaintiffs are barred from recovery herein.

### SEVENTEENTH DEFENSE

185.    The Complaint fails to state facts sufficient to permit an award of punitive damages, and any such award would violate due process.

### EIGHTEENTH DEFENSE

186.    The Complaint, and each and every cause of action alleged therein, fails to state any facts supporting any claim for punitive or exemplary damages.

### NINETEENTH DEFENSE

187.    The Complaint, and each and every cause of action alleged therein, is barred in whole or in part because at all material times, Defendant acted in good faith and without malice based upon all relevant facts and circumstances known by Defendant at the time.

### TWENTIETH DEFENSE

188.    Plaintiffs, and their agents, servants, and employees, have failed to bring the causes of action alleged in the Complaint in a timely manner and are therefore barred from recovery against Defendant, in whole or in part, by the equitable doctrine of laches.

### TWENTY-FIRST DEFENSE

189.    Defendant alleges that in the event she is found in some manner legally liable to Plaintiffs as a result of the events or occurrences described in the Complaint, that liability will be solely based upon a derivative, vicarious, or imputed form of liability, not resulting from her own conduct, but instead based upon an obligation imposed upon her by law, or by the conduct of

others, and as such the legal liability of Defendant would be proximately caused by the acts or omissions of others and therefore Defendant is entitled to recover contribution from them.

### TWENTY-SECOND DEFENSE

190.     Defendant alleges that in the event she is found in some manner legally liable to Plaintiffs as a result of the events or occurrences described in the Complaint, that liability will be based solely upon a derivative, vicarious, or imputed form of liability, not resulting from her own conduct, but instead based upon an obligation imposed upon her by law, or by the conduct of others, and as such the legal liability of Defendant would be proximately caused by acts or omissions of others and therefore, Defendant is entitled to recover total and complete implied and/or comparable indemnity from them.

### TWENTY-THIRD DEFENSE

191.     Defendant alleges that in the event she is found in some manner legally liable to Plaintiffs as a result of the events or occurrences described in the Complaint, that liability will be based solely upon a derivative vicarious, or imputed form of liability, not resulting from her own conduct, but instead based upon an obligation imposed upon her by law, or by the conduct of others, and as such the legal liability of Defendant would be proximately caused by acts or omissions of others and therefore, Defendant is entitled to recover total and complete equitable indemnity from them.

### TWENTY-FOURTH DEFENSE

192.     Any injury or damage to Plaintiffs, which Defendant specifically denies, was proximately caused by the negligence, recklessness, or intentional conduct of others who acted as one or more of the Plaintiffs' legal counsel, agents, or representatives. Accordingly, if any liability

is found on the part of Defendant, then Defendant's liability to Plaintiffs shall be reduced on the basis of comparative fault.

### TWENTY-FIFTH DEFENSE

193.    Any injury or damage to Plaintiffs, which Defendant specifically denies, was proximately caused by the negligence of Plaintiffs.

### TWENTY-SIXTH DEFENSE

194.    Plaintiffs' alleged damages are too speculative to permit recovery in this case.

### TWENTY-SEVENTH DEFENSE

195.    The Complaint, and each and every cause of action alleged therein, is barred in whole or in part by the doctrine of *in pari delicto*.

### TWENTY-EIGHTH DEFENSE

196.    The Complaint, and each and every cause of action alleged against Defendant therein, fails to allege facts sufficient to allow recovery of attorneys' fees from Defendant.

### TWENTY-NINTH DEFENSE

197.    The Complaint, and each and every cause of action alleged therein, is barred in whole or in part by California Labor Code Section 925.

### THIRTIETH DEFENSE

198.    The Complaint, and each and every cause of action alleged therein, is barred in whole or in part by California Business & Professions Code Section 16600.

### THIRTY-FIRST DEFENSE

199.    The Complaint, and each and every cause of action alleged therein, is barred in whole or in part by California Government Code Section 12964.5.

### RESERVATION OF ADDITIONAL DEFENSES

200.     Defendant presently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated affirmative or other defenses available. Defendant reserves the right to assert additional defenses in the event that discovery indicates they would be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Jennifer Abel prays for relief as follows:

1.     That the Complaint be dismissed with prejudice, and Plaintiffs take nothing herein;

2.     That judgment be entered in favor of Defendant and against Plaintiffs;

3.     For costs of suit incurred in this action; and

4.     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Defendant demands a jury trial on all causes of action so triable.

## COUNTERCLAIMS OF JENNIFER ABEL

Jennifer Abel ("Abel" or "Counterclaimant"), by and through undersigned counsel, as and for her counterclaims against Stephanie Jones (Jones") and Jonesworks LLC ("Jonesworks"), alleges as follows based on knowledge as to her own conduct and activities and on information and belief as to all other matters except where otherwise alleged:

### PARTIES

1.    Defendant/Counterclaimant Jennifer Abel is, and at all times relevant was, an individual residing in Beverly Hills, California.

2.    Plaintiff/Counterclaim-Defendant Stephanie Jones is, and at all times relevant was, an individual residing in Greenwich, Connecticut.

3.    Plaintiff/Counterclaim-Defendant Jonesworks LLC is, and at all times relevant was, a Delaware limited liability company with its principal place of business in New York, New York. None of Jonesworks' members are citizens of California.

4.    There exists, and at all times herein mentioned there existed, a unity of interest between Jonesworks and Jones such that any individuality and separateness has ceased, and Jonesworks is the alter ego of Jones.

5.    At all relevant times herein, each of Jones and Jonesworks was the agent, servant, employee, employer, joint-venturer, partner, and/or alter ego of the other and was at all times operating and acting within the purpose and scope of said agency, service, employment, joint venture, partnership, and/or alter ego. Each of Jones and Jonesworks has rendered substantial assistance and encouragement to the other, acting in concert knowing that her/its conduct was wrongful and/or unlawful, and each of Jones and Jonesworks has ratified and approved the acts of the other.

## JURISDICTION AND VENUE

6.     This Court has original jurisdiction over the claims for relief asserted in this counterclaim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and no Counterclaim-Defendant is a citizen of the same state as Counterclaimant. This Court also has supplemental jurisdiction over the claims for relief asserted in this counterclaim pursuant to 28 U.S.C. § 1367(a) because such claims are so related to claims in the action that they form part of the same case or controversy under Article III of the U.S. Constitution.

7.     This Court may exercise personal jurisdiction over the Counterclaim-Defendants pursuant to Section 301 of the New York Civil Practice Law and Rules because all of them systemically and continuously conduct and solicit business within New York and have availed themselves of the privileges of conducting business in the State of New York.

8.     This Court may exercise personal jurisdiction over the Counterclaim-Defendants pursuant to CPLR 302 because all of them transact and solicit business within the State of New York and have committed the tortious acts described herein within the State of New York.

9.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because a substantial part of the events or omissions giving rise to these claims occurred in this District and because the Counterclaim-Defendants are subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

10.     Jonesworks is a well-known New York-based public relations firm founded by Stephanie Jones, who serves as its CEO.

11.     Long known within the public relations industry for her disarming Southern twang, brass-knuckle tactics, and high turnover of clients and employees, Stephanie Jones has had a

successful career in the entertainment industry. Her firm, Jonesworks, has represented, at various times, Dwayne "The Rock" Johnson, Jeff Bezos, Lauren Sanchez, Venus Williams, Tom Brady, and Chris Hemsworth.

12.    Jones is married to Jason Hodes ("Hodes"), a partner at William Morris Endeavor ("WME"), Hollywood's most powerful talent agency. Between her perch atop Jonesworks and his partnership at WME, Jones and Hodes are a bona fide Hollywood power couple.

13.    When Jones poached Jennifer Abel, Abel was an up-and-coming star publicist at R&CPMK, a storied 70-year-old public relations arm of Interpublic Group, a 53,000-employee publicly-traded multinational marketing behemoth. At the time of her departure from R&CPMK, Abel had worked there for nearly 12 years and held the title of Vice President.

14.    In or around late spring 2020, at the height of the COVID-19 pandemic, Jones, through a recruiter, reached out to Abel via LinkedIn about joining Jonesworks. Although Abel was content at R&CPMK and not actively looking for a new job, Jones offered her a higher salary and, critically, the opportunity to lead her own team.

15.    When Abel announced her intention to join Jonesworks, she was met with a parade of concern from across her professional network. An array of well-respected public relations professionals from across the entertainment industry reached out to Abel to caution her against working for Stephanie Jones. Jones, they warned, had a well-deserved reputation for treating people horribly. Jones had recently become embroiled in a dispute with another public relations firm for stealing its clients using deceptive and unscrupulous means.

16.    Excited by the new opportunity and not personally familiar with Jones or Jonesworks, Abel decided to make the jump in spite of the admonitions from her peers.

17.    On or about July 9, 2020, Abel was hired by Jonesworks as Vice President. Her

mandate was to oversee Jonesworks' talent department and grow its nascent Los Angeles office, which at the time had only four employees.

18.    In connection with and as a condition of her employment, Abel signed a Non-Disclosure and Intellectual Property Rights and Non-Solicitation Agreement (the "2020 Employment Agreement").

19.    Abel was not represented by counsel in connection with the negotiation or execution of the 2020 Employment Agreement.

20.    The 2020 Employment Agreement provided that Abel was an "at-will" employee whose employment was "exclusive" to Jonesworks during the period of her employment. It also contained a confidentiality clause pursuant to which Abel was required to maintain the confidentiality of and not disclose "Confidential Information," as the term is (expansively) defined therein, provisions purporting to restrict Abel's ability to speak truthfully about her experiences at Jonesworks, and a host of restrictive covenants, including non-competition and non-solicitation covenants.

21.    The 2020 Employment Agreement also contained a California choice of law provision providing that "[it] has been made and shall be interpreted in accordance with the laws of the State of California without regard to conflicts of law principles."

22.    Within a few weeks of Abel's on-boarding, Jonesworks faced a mass exodus of employees in its New York office. While Abel was understandably concerned, Jones assured her that all of the departing employees were "horrible" at their jobs and were going to be fired regardless. Little did Abel then know that turnover of that magnitude was typical at Jonesworks, which routinely faced large-scale departures by disgruntled and demoralized employees. What Abel did quickly realize is that morale amongst Jonesworks employees was outright abysmal, that

such departures were invariably acrimonious, and that departing employees and current employees alike were extremely tight-lipped and fearful of engaging in any sort of discussion about their experience at Jonesworks.

23.     Abel observed that morale among Jonesworks employees was inversely correlated with physical proximity to Jones. Thus, the Los Angeles office was generally a more positive environment than the New York office.

24.     Abel was also surprised to learn that, in spite of its size, Jonesworks lacked any sort of human resources department or dedicated human resources personnel. Jones instead relied on business affairs personnel and her various chiefs of staff to handle any personnel-related matters. In part due to the lack of a human resources department or grievance reporting structure and fear of backlash from Jones, Jonesworks had a toxic workplace culture in which employees, lacking an outlet or meaningful recourse, constantly gossiped and complained amongst themselves and leaned on senior employees for solutions to workplace issues.

25.     Unlike most workplaces, Jonesworks also lacked written internal policies, including regarding the usage of electronic devices, or an employee handbook. At no point during Abel's employment did she see, hear about, or sign anything of the sort. The only terms governing Abel's employment were those set forth in her employment agreements.

26.     Because public relations jobs require extensive mobile phone usage, public relations firms often assume the costs of their employees' phones and phone usage. Jonesworks was no exception. While Abel had an Android, Jones offered to switch her to a Jonesworks-issued iPhone, which required that she "port" her existing, long-time phone number to the Jonesworks company phone plan. Abel had no problem with this, so long as she could retain ownership of her phone number and bring it with her should she leave Jonesworks. Although Jonesworks owned

the physical device, it was configured with Abel's personal Apple ID and populated with all of her personal email accounts, photos, text messages, third party apps, etc. Abel had no concerns about using her Jonesworks-issued cell phone freely and as her sole mobile device, as such practices are common in her industry (where pay can be low), and neither Jones nor anyone else at Jonesworks advised her against doing so. Jonesworks did not have any internal policies that prohibited such use, gave it the right to monitor such use, or divested employees of a reasonable expectation of privacy in relation to such use. Thus, Abel had no reason whatsoever to believe that Jonesworks' ownership of the physical device would or could in any way compromise her right to privacy in the personal data or accounts stored on it or accessible from it. Jonesworks would not have any right to access or monitor, for example, her personal email accounts, text messages, photos, or bank accounts.

27.    Notwithstanding the continued large-scale departures from the Jonesworks New York office, Abel quickly became a leader of the California operation. Within two years, Abel had grown the Los Angeles headcount from four employees to 12. All the while, Abel wore an array of hats, working tirelessly without a commensurate increase in compensation.

28.    On or about November 22, 2021, Jonesworks required Abel to enter into a modified employment agreement (the "2021 Employment Agreement") changing her employment from at-will to a contractual term, adjusting her title and compensation, and subjecting her to a variety of novel restrictions intended to deter her from leaving Jonesworks and inhibiting her ability to remain in her chosen field if she were to do so.

29.    Abel was not represented by counsel in connection with the negotiation or execution of the 2021 Employment Agreement.

30.    The 2021 Employment Agreement, like its predecessor, contained an expansively

drafted confidentiality provision as well as a host of restrictive covenants, including non-competition and non-solicitation covenants.

31.    Unlike the 2020 Employment Agreement, the 2021 Employment Agreement contained a New York choice of law provision providing as follows: "This Agreement and the performance of the Parties' obligations hereunder will be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law principles."

32.    At all times during Abel's employment at Jonesworks, Abel was a resident of the County of Los Angeles, State of California; was based out of Jonesworks' Los Angeles office, and performed the overwhelming majority of her work within the State of California. Abel has lived and worked in California for the entirety of her adult life. Since graduating from college, Abel has maintained virtually no connection to the State of New York. She has not lived there, maintained a residence there, performed any significant amount of work there, or even travelled there more than a handful of times. She was, at all times, a California resident and California employee entitled to the protections of the laws of the State of California. Apart from infrequent business travel, Abel performed no work for Jonesworks in the State of New York.

33.    It is clear that Jonesworks required Abel to agree to a New York choice of law provision because it wanted the ability to bind her to restrictive covenants, such as non-competition and non-solicitation covenants, that would be void *ab initio* in California and to deprive Abel of the protections of California substantive law.

34.    By Abel's second year, Jones appeared to be deteriorating. Abel began to harbor increasing concerns about Jones' mental stability and ability to manage client and employee relations.

35.    At around this time, Jones started making FaceTime calls to Abel and other

employees at notably odd hours. Jones' communications frequently tracked through the night and into the next morning, suggesting that she had not been sleeping at all. Concurrently (and likely relatedly), Jones became noticeably more paranoid and irascible, often accusing Abel and others of plotting against her. It became more difficult to communicate with Jones, settle her nerves, or even track her train of thought.

36.    Due to extremely draconian NDAs, Jones' threats, and the climate of fear pervading (past and present) Jonesworks employees and clients alike, Jones' worst excesses were largely hidden from view until in or around May 2024, when Puck reported that Sanchez and Johnson had dropped Jones as their publicist. While these were among the most prominent and publicly reported departures, a cascade of Jonesworks clients began to cut ties with Jones, especially after word had spread that Business Insider was contacting Jones' former and current clients and employees concerning a forthcoming article about her sordid behavior.

37.    On May 8, 2024, a website called "Stephanie Jones Leaks" went live, along with an X.com account, a Facebook page, a Reddit account, and a Pinterest page. These platforms disclosed a litany of highly disturbing allegations about Jones' behavior and business practices, many concerning Jones' mistreatment of Jonesworks employees and clients.

38.    Abel had no involvement of any kind in "Stephanie Jones Leaks."

39.    These revelations caused a firestorm in Hollywood, resulting in a surge of negative publicity regarding Jones, including the publication of the Business Insider piece entitled "Who's Afraid of Stephanie Jones." *See* Katie Warren and Jack Newsham, "Who's Afraid of Stephanie Jones," Business Insider (Aug. 17, 2024), https://www.businessinsider.com/stephanie-jones-jonesworks-pr-clients-tom-brady-jeff-bezos.

40.    Abel was not responsible for the Business Insider piece and learned of it for the

first time from Jones herself in or around early-July 2024.

41.     The Business Insider piece shed more light on the real Jones. Always a volatile personality, Jones had become noticeably more paranoid, erratic, and cruel in recent years.

42.     The Business Insider story also shed light on the toxic workplace Jones had fostered at Jonesworks. At the office, Jones would regularly turn on deafening music so that she could berate her employees free from scrutiny. "I don't think there was one day in the office that someone wasn't crying," said a former employee.

43.     Jones also pried into her employees' private lives without invitation. As detailed by Business Insider, when employees called in sick, Jones would FaceTime them to confirm they were actually sick. In at least one instance, an employee who had taken a personal day to attend a funeral received a FaceTime call from Jones during the ceremony. Jones was apparently suspicious of his whereabouts.

44.     As discussed above but disclosed publicly by Business Insider, turnover rates at Jonesworks were extraordinary. These departures included not only junior employees—who often left after less than a year—but also senior executives who managed client accounts. Jones seldom allowed them to go amicably, often enlisting attorneys to threaten and intimidate them into agreeing not to disparage Jones.

45.     In April 2023, Dwayne "The Rock" Johnson dropped Jonesworks after clashes between Jones and Johnson's team. Jonesworks had handled Johnson's personal PR, as well as that of his production company, tequila brand, clothing company, and business partner, Dany Garcia. This was a big loss for Jones and one that she kept under wraps from media in order to leverage opportunities for other clients. In the following months, Jones was also dropped by Bezos, Sanchez, Lainey Wilson, Chris Hemsworth, Wheels Up, Ocean Spray, and Partake Foods.

46.     Through it all, Abel remained loyal to Jones, sticking with her through thick and thin despite growing doubts about Jones' ability to function professionally.

47.     By 2024, however, Jones had become increasingly embittered and hostile towards Abel. Jones frequently criticized Abel's management, manifested extreme paranoia about Abel's close relationships with clients and partners, and went out of her way to reprimand, demean, and embarrass Abel in front of junior employees she oversaw.

48.     Over time, Abel's concern about Jones' obvious downward spiral was heightened by the reality that there was no bottom in sight. In the final months of Abel's tenure, Jones had become even more erratic, clearly not sleeping, calling at all hours of the night in a frenzied state, senselessly pitting her own employees against each other, focusing her energy on "catching" employees in perceived acts of disloyalty, lowering morale still further, and torching her relationships with remaining Jonesworks clients.

49.     Although Jones had always been volatile, she now appeared to be actively unraveling. Abel was frequently on the receiving end of her (often bizarre) outbursts. In one instance, Jones announced to Abel's subordinates that she had learned through psychic readings that Abel was an alcoholic and a gambling addict. Even if these statements were true, Jones' public announcement would be (at best) highly inappropriate. Here, however, the accusations are not remotely true! They have literally no basis in reality, and the employees to whom Jones made her pronouncement were well aware of that. While Jones presumably intended to undermine Abel's credibility, she had actually significantly undermined her own and raised alarm about whether Jones was in the midst of a mental breakdown. On a different occasion, Jones announced, again per her psychic, that Abel would soon be pregnant with twins, humiliating and infuriating Abel, who—Jones knew—had struggled with fertility issues.

50.     Abel was also disgusted by Jones' pattern and practice of creating fake social media accounts to troll former employees and journalists she deemed hostile, including Puck News' Matt Belloni. Jones was obsessed with Belloni, in particular. Abel also witnessed Jones working with journalists to plant and contribute to negative stories about former Jonesworks clients who had fired Jonesworks/Jones.

51.     When Abel requested that Jonesworks offer its Los Angeles employees a modest 2% cost of living raise, Jones—who spent obscene amounts of Jonesworks money on lunches, champagne, and manicures—told her that if that were to happen, it would have to come from Abel's paycheck.

52.     Already pushed to the brink, Abel finally had enough when Jones demanded she corroborate falsified accusations about a senior Jonesworks employee in an effort to drive him out. When Abel refused to go along with it, Jones responded with mockery, calling her a "12-year-old drama queen."

53.     On or about July 10, 2024, Abel notified Jones of her departure from Jonesworks. Abel later confirmed her decision on July 26, 2024, and communicated her intention to start her own business. Abel offered a six-week transition period, with an end date of August 23, 2024.

54.     Predictably, Jones took the news poorly, to say the least. Consistent with her increasingly erratic behavior, Jones swung from extreme to extreme, one minute desperately attempting to convince Abel to stay, the next berating her and cutting her out.

55.     While Abel was resolute about leaving, she had every intention of doing so amicably, a sentiment she repeatedly conveyed to Jones.

56.     However, as Abel's end date drew closer, Jones grew more combative. With several weeks left in her tenure and innumerable client matters to handle, Abel found that she had been

removed from client email distribution lists and left in the dark about meetings, calls, and events she was expected to attend. It was clear to Abel that Jones was trying to embarrass Abel and tarnish her professional reputation in advance of her departure.

57.    In her final week, Abel contacted Jones' chief and staff, Gordon Duren, concerning the release of her phone number and transfer of her personal data upon her departure. As previously discussed, when Abel joined Jonesworks in 2020, she ported her existing phone number (which she had used since high school) and switched to a Jonesworks-issued iPhone. Knowing that she would have to turn over the physical device upon her departure, Abel arranged for her phone number to be "released" so she could port it to a new device and retain decades worth of personal contacts, photos, private conversations with friends and family, and confidential financial data and access to accounts protected by two-factor authentication. Jonesworks' chief of staff assured her multiple times in writing that Jonesworks would cooperate and uphold their agreement. At no point during her tenure did Abel consent to anyone at Jonesworks accessing, reviewing, or monitoring the contents of the device. Jonesworks did not have a policy in place affording them the right to do so. Neither Jones nor Duren suggested otherwise.

58.     Abel's willingness to let Jonesworks port her personal cell phone number to its

phone plan was predicated on her reasonable expectation that she would retain sole and exclusive

access to its contents and her private data and accounts. Had there been any reason to believe

otherwise, Abel would ***never*** have agreed to the arrangement. Indeed, it would be unimaginable to

afford her employer the right to access or monitor—much less assert ownership of—all her private

data. As a result of Jonesworks' continued representations, Abel was caught completely off guard

by what they did next.





***Jones and Jonesworks Steal All of Abel's Private Data and Communications***

59.    On August 21, 2024, two days before her last day, Abel pulled up to the Jonesworks office in Beverly Hills. There, she was confronted by a physically imposing security guard, a forensic data extraction technical expert, and an attorney sitting at a conference table awash in documents. On information and belief, the attorney was affiliated with the firm Frankfurt Kurnit Klein & Selz, and the security and technology personnel were from Edgeworth Security Services ("Edgeworth"). Also present was Jones' chief of staff, Duren, who had flown in unannounced from New York.

60.    Apart from Jones' chief of staff, Abel had never seen any of them before. After being ushered into the conference room, Abel noticed that the security guard was posted just outside its doors, positioned between the conference room and the office entrance, blocking the exit. She inferred that she was not free to leave.

61.    There, the attorney gestured at the documents and instructed Abel to review and sign them. The attorney stated that Jonesworks suspected Abel had retained proprietary information on her personal laptop. Abel was told that Jonesworks would have grounds to sue if she did not allow them access.

62.    Caught completely off guard, Abel was in shock over the hostile and intimidating display. Having never experienced anything like this, she had no idea what to do. Fearful that she would burst into tears and humiliate herself (which she knew was what Jones wanted), Abel dissociated. Given the coercion and threats by Jonesworks' attorney, Abel understood that she could not leave without signing the documents, at least not without subjecting herself to legal action. Under extreme duress, Abel hurriedly signed the documents in the hope that she would be able to leave without interference. She did not digest their contents, however.

63.     After she signed the papers, Jonesworks' attorney demanded that Abel hand over her personal laptop. Abel complied. The Edgeworth contractor then conducted a forensic search of her system that turned up *nothing*. Thereafter, the attorney furnished a list of approximately 10 documents and accused Abel of having illicitly accessed and stolen them. Abel adamantly denied the accusation which was untrue. A further forensic examination of her computer again turned up nothing.

64.     Following the fruitless search of Abel's laptop, Duren demanded that Abel hand over her phone, after which security would escort her out of the building. Abel was ordered to provide the passcode, which she was told was solely to facilitate the release of the phone number. While Abel had agreed to provide access to her laptop for a limited search in her presence, she did not consent to and was not asked to consent to a search of the contents of the iPhone. Because Abel had been ambushed, she had not had sufficient warning or time to wipe personal information from the phone, de-register it from her personal iCloud or email accounts, or otherwise secure the vast troves of personal and private data accessible from it. She had no reason to believe Jonesworks would attempt to access such data, or she would not have turned the device over without making prior arrangements to secure it.

65.     Still shell-shocked, intimidated by Jones' lawyer and security team and desperate to leave, Abel reluctantly handed over her phone and provided her passcode for the limited purpose of facilitating the transfer of her number. It would also allow Abel to get a new phone and move on with her life without undue disruption. After express confirmation from Duren and the Jonesworks attorney that they would release the phone number if she went straight to the Verizon store, Abel handed them the phone and was ushered out of the building as her colleagues watched in disbelief. Seeing that Abel had been stripped of her phone (and therefore had no way to contact

anyone), some current Jonesworks employees reached out to Abel's partner, family, friends, and former co-workers to let them know what had happened.

66.    Abel went straight to a Verizon store a short distance away. Once there, Verizon contacted Jonesworks to coordinate the release and transfer. Duren assured Abel and Verizon that they were in the process of effectuating the release and to bear with them for a few minutes. Abel never heard from him again. After four hours of desperate (unanswered) calls, Abel left Verizon in panic and despair. Abel realized Jones had double-crossed her—in a very serious way. By refusing to release Abel's phone number, Jonesworks had usurped Abel's private information and cut off Abel's access to critical accounts protected by two-factor authentication. As a result, Abel lost access to bank accounts, utilities, insurance, and virtually every other sensitive account.

67.    By contrast, Jones now had unrestricted access to everything stored on Abel's phone—her text messages, emails, personal photos. Jones could read her communications with her



fiancé, parents, friends—everyone. Jones was acting purely out of spite.

68.     It took Abel over a month to regain control over all her accounts. Meanwhile, she learned that Jones had been sharing her private text messages with the entire office, mocking and disparaging her. Having torched Abel's privacy and dignity, Jones started boasting that Abel's business was next.

69.     What Abel could not foresee was that Jones and Jonesworks' gross invasion of her privacy would not stop upon her departure. In fact, it escalated. Jones and Jonesworks retained access to Abel's iCloud for multiple months thereafter, monitoring and intercepting her private communications in real-time.

70.     Abel was under the mistaken impression that by switching phone numbers, she had cut off Jones' and Jonesworks' access to her text exchanges. Not so. In fact, Abel's text messages were tied to her iCloud, not her phone number. Until Abel changed her iCloud password *in January 2025* for unrelated reasons, Jones had been intercepting and monitoring all of her text exchanges, including not only with her clients, fiancé, doctors, parents, and friends but also with the undersigned counsel. Indeed, the intrusion ceased only by happenstance during the pendency of this litigation.

### *The Wayfarer/Baldoni Account*

71.     For almost four years, Abel largely managed Jonesworks' work for Wayfarer Studios and Justin Baldoni out of its Los Angeles office. Over time, Abel developed a close and trusting relationship with Baldoni, Wayfarer CEO Jamey Heath, and the rest of the Wayfarer team, particularly as their strategic communications needs became ever more complex in relation to *It Ends With Us*.

72.     At all times during Wayfarer's four-year engagement with Jonesworks, Abel was

the point person on the account. It was very clear to Wayfarer—and Jones largely did not hide—

that Jones considered them to be a "lower prestige" client and devoted her attention to clients such

as Jeff Bezos and Tom Brady.

73.     But Jonesworks was in utter turmoil by July 2024. Already bleeding clients and

personnel, Jones learned that Business Insider was working on an unflattering story about her set

to be published sometime in August. Jones felt that her reputation had been severely damaged by

the "Stephanie Jones Leaks" website and social media accounts. Jones was desperate to keep her

remaining clients. Given Abel's close relationship with Wayfarer and Baldoni, Jones was

undoubtedly concerned they would leave Jonesworks alongside her. And she wanted to make sure

that did not happen.

74.     At the time, Wayfarer and Baldoni were in the midst of a massive PR crisis, as news

stories began to trickle out speculating about possible tension between Lively and Baldoni (largely

due to the cast no longer following him on social media) just as the Film was about to premiere.

Jones started participating in meetings, calls, and written correspondence to reassert her authority

over the account and convey her engagement to Wayfarer.

75.     Wayfarer and Baldoni asked Abel to recommend a crisis management specialist.

After consulting with Jones, who had no viable ideas, Abel recommended that Wayfarer and

Baldoni engage crisis PR expert Melissa Nathan to assist in navigating these choppy waters. Abel

had confidence in Nathan, as they had worked together extensively in connection with a different

Jonesworks client. The need for crisis PR expertise was particularly acute due to Lively's demand

that Baldoni not be permitted to attend the premiere and the threat that Baldoni would be excluded

from the press junket with the rest of the cast. Abel learned during her initial discussion with

Nathan that, per her media contacts, a negative story was already being "shopped" around to

49

multiple outlets, positioning Baldoni's religion as a "cult" and accusing Baldoni of having "fat shamed" Lively after he asked her personal trainer in private about her weight due to his history of severe back pain.

76.     Even though Abel felt strongly that Nathan was the right choice, she knew that Jones would be unhappy with the recommendation. Jones viewed Nathan as a competitor and had a history of bad-mouthing her to anyone who would listen, including to Nathan's own clients. Out of sensitivity for these considerations, Abel advised the Wayfarer team to remain open to other possible options and to decide after meeting Nathan themselves. Abel feared backlash from Jones but felt strongly that Nathan was the best option. When Jones learned that Wayfarer was considering retaining Nathan, she was furious and immediately lashed out at Abel, pressuring her to disparage Nathan as a demonstration of loyalty to Jones. After initially pushing back, Abel eventually relented after Jones called her crying and screaming and engaged in some "light" disparaging of Nathan to placate Jones. Jones then attempted to derail the engagement and exploited confidential client information to convince Wayfarer not to move forward with Nathan.

77.     While Heath, Wayfarer's CEO, acknowledged Jones' position, he told her Wayfarer would make its own decision after meeting Nathan.

78.     Jones inserted herself into the mix in early August 2024, seeking to box out Nathan and Abel. The problem, however, was that Jones had chosen not to be pay attention to Wayfarer leadership's communications strategy or internal decision-making, having long claimed to be too busy with higher-profile clients. Wayfarer was fine with Jones' disengagement, as Abel was their trusted advisor, and they had no interest in being a pawn in Jonesworks office politics. In addition, Jones had chosen to take a lengthy vacation in Europe during this critical period of the press campaign and premiere of the Film. Even from afar, Jones' efforts were ham-fisted, unwelcome,

and sporadic given her distance from Wayfarer's day-to-day business. As Jones tried to stir up drama and undermine Abel's authority, Wayfarer and Baldoni were focused solely on managing the crisis in front of them.

79.    Notwithstanding Jones' general disengagement, it is not true that she was kept in the dark. To the extent she was out of the loop, it was by choice. Jones was copied on virtually all communications during this period and was privy to Wayfarer's predicament and its chosen strategy of non-confrontation. Had there been a "smear campaign," as was later alleged by her and the Lively Parties,[1] Jones would undoubtedly have known about it in real time. "I have been deeply involved in strategy, planning, account management and high level PR and media comms as well as crisis[,]" admitted Jones in an email on August 21, 2024.

80.    At the time, Lively's and Baldoni's teams had negotiated an uneasy truce in which neither side would participate in negative coverage of the other. Lively's team had already broken that truce, but the Wayfarer team did not know that then. As far as they were concerned, it was best for Baldoni, Lively, and the Film if both sides agreed to keep the peace, though Wayfarer's team had to date been acting only defensively in responding to press inquiries.

81.    But on August 8, 2024, Jones, in another desperate attempt to re-insert herself, contacted a Daily Mail reporter about a story they had published about Baldoni and Lively. She did so in direct violation of Wayfarer's instruction not to talk to the press given the truce with Lively's team. Nonetheless, Jones bragged to Wayfarer about "trading calls" with the Daily Mail in an effort to appear engaged on the account. Nathan and Abel were left to deal with the fallout.

---

[1] Blake Lively, Ryan Reynolds, Leslie Sloane, and Vision PR.



82. This blatant disregard of Wayfarer's strategy sparked a chain of unfortunate developments. Sloane and Sony learned that, purportedly, "someone from Baldoni's team had been communicating negatively to media." It was clearly Jones, and Wayfarer's leadership was livid. As was Sony. All parties were desperate to prevent an all-out slugfest between Lively and Baldoni just as the Film was about to be released to the world. With her reckless and unauthorized activities, Jones had made that scenario much more likely. In response, Wayfarer instructed Jones to cease

all activities on behalf of Wayfarer and Baldoni for the time being and to let Abel and another Los

Angeles-based Jonesworks employee, Matthew Mitchell, handle the crisis alongside Nathan.

83.    At this time, Nathan started hearing from other journalists that Sloane was planting

negative stories about Baldoni and was under the impression that Baldoni's camp had broken the

truce. Anxious Sony executives began reaching out to Wayfarer seeking clarity.

84.    Yet Jones, panicked about being blamed, refused to be sidelined, insisting that she

*needed* to contact Sony's and Lively's PR teams to clarify that she had not planted any negative

stories about Lively. Heath told her not to do that, to which Jones responded that she could do

"whatever she wants" to clear her name and that Wayfarer could not stop her from making calls.

Desperate to salvage her reputation with Lively and Sony, Jones emailed a number of key Sony

executives working on the Film to declare that she was in Europe with "her husband, partner at

WME Jason Hodes" and placing all blame on "her team." In her attempt to save face, Jones

ruptured her relationship with Wayfarer and Baldoni.

85.    Although Jones ultimately agreed to stand down, Wayfarer and Baldoni expressed

that they had lost all trust in her. After parachuting in for self-interested reasons, nearly blowing

up the truce with Lively's team, and lashing out when told to stop, Jones became a magnet for

drama when it was least needed.

86.    As September drew near, Wayfarer and Baldoni—with the assistance of Abel and

Nathan—continued their tireless efforts to promote the Film, put out fires, and see the project

through to the finish line. Stewing in jealousy towards Abel and resentment towards

Wayfarer/Baldoni, Jones clearly saw the writing on the wall. Knowing she would soon be

terminated, Jones started taking steps transparently intended to make it harder to cut her loose.

Those steps included sending email after unwelcome email to Heath and others—long after their

relationship had irrevocably ruptured—to lay the groundwork to contest that she had been detached and nonresponsive for years. This was especially galling, as Jones had been in Europe and largely incommunicado—save for a few texts of support to Baldoni prior to the premiere and then her disastrous efforts at self-preservation—for weeks during the critical month of August when the Film premiered.

87.     In contrast with Abel, who was loyal, trusted, and even-tempered while working around the clock through the crisis, Jones was a walking disaster whose self-absorption, disloyalty, and insubordination had become a significant headache.

88.     Rather than accept the end of the Wayfarer relationship with professionalism and decorum, Jones started threatening to sue, demanding exorbitant payment for work not done, and protesting that she had done an amazing job.

89.     On information and belief, Jones stewed in resentment and indignity, unable to bear the loss of another Jonesworks client. She set out to take revenge on Abel, Wayfarer, Baldoni, and Nathan, exploiting the data she had unlawfully accessed and stolen from Abel's phone.

90.     Jones disclosed at least some of Abel's private communications to the Lively Parties no later than August 21, 2024. Sloane, Lively's publicist, confirmed as much to Nathan on a phone call that evening. Sloane gloated that, based on what she had already seen, Nathan could expect to be sued. These communications were drawn largely from Abel's iCloud, which was accessible through the confiscated iPhone. Despite lacking Abel's consent to access, review, or disseminate these communications, Jones and Jonesworks were able to do so without difficulty because, with the iPhone in hand, they could bypass the password protection that would otherwise bar their access.

91.     Shortly thereafter, Jones took things a step further and transmitted Abel's stolen

communications directly to Sloane, Lively, and Reynolds.

92.     At the time, Lively was reeling from a storm of negative publicity. Devoid of scruples concerning the unlawful means by which Jones obtained the communications and desperate for a scapegoat for Lively's bad press, the Lively Parties likely saw a unique opportunity. While the contents of Abel's communications do not support the existence of an "untraceable smear campaign," they do show that by the time of the Film's premiere, Abel and others in Wayfarer's circle held Lively in deep disdain and, to a certain extent, relished in her self-immolation. These sentiments were the natural result of the Wayfarer Parties' first-hand knowledge of Lively's vicious behavior and malignant persona.

93.     In turning over these materials to the Lively Parties, Jones knew full well how they would be used. With slicing, dicing, cherry-picking, massaging, and in some cases outright alteration, the Lively Parties exploited Abel's text messages to great effect. Joining forces with the New York Times, the Lively Parties commissioned the hit.

94.     However, for different reasons, the Lively Parties, on the one hand, and Jones and Jonesworks, on the other hand, needed to create a veneer of legitimacy. The Lively Parties likely anticipated—or were told directly—that the New York Times would not traffic in stolen communications under these circumstances and needed the color of law. Jones and Jonesworks, for their part, wanted to insulate themselves from legal exposure to Wayfarer for breaches of confidentiality.

95.     Accordingly, on September 27, 2024, working hand in glove with Jones and Jonesworks, the Lively Parties and their counsel at Manatt, Phelps & Phillips, LLP ("Manatt") initiated a sham legal proceeding in New York state court, *Vanzan, Inc. v. Does 1-10, inclusive*, Index No. 655130/2024. The sham lawsuit was nothing more than a transparent ploy to obtain

subpoena power. The Plaintiff, Vanzan, Inc. ("Vanzan"), is an inactive corporate entity affiliated with Lively and Reynolds and entirely unrelated to the Film or the Wayfarer Parties. The lawsuit asserts three causes of action: breach of contract, breach of the implied covenant of good faith and fair dealing, and faithless servant against Doe defendants only. The lawsuit does not explain how or why Vanzan was unable to identify the proper defendants, especially in the context of a *breach of contract action*.

96.    Instead, Vanzan (Lively and Reynolds) and Manatt implausibly claim not to be privy to the identities of its own contractual counterparties or its own "employees, contractors, agents, or representatives[.]" The lawsuit is devoid of specific allegations against anyone, much less Abel, relying exclusively on generalized recitations of boilerplate legal jargon. Notably, Vanzan never requested the assignment of a judge, substituted the Doe defendants for named parties, or served the complaint on any defendant. The only docket entries are the complaint and a notice of dismissal filed on December 19, 2024, the day before Lively filed her CRD Complaint against the Wayfarer Parties.

97.    *The same day the lawsuit was filed*, September 27, 2024, Jones warned a departing employee not to work for Abel because "her business wouldn't be around much longer."

98.    Once the lawsuit was filed, the Lively Parties used it to issue a subpoena to Jonesworks for all data stored on Abel's phone, including private communications from her iCloud and email accounts, as well as potentially privileged information. Since there were no identifiable parties and no party had been served, the subpoenas were issued without notice, depriving Abel of any knowledge of the subpoena, much less the opportunity to object.

99.    Plaintiff is informed and believes, and based thereon alleges, that the sham lawsuit was contrived by the Lively Parties and Jones, acting in concert, to facilitate and cover up Jones'

release of the data extracted from Abel's phone and personal accounts under the guise of legal process, without risking detection by interested parties, such as Abel, who could have intervened to stop the flagrant abuse of process.

100.    As planned by the parties, upon receipt of the sham subpoena, on or about October 1, 2024, Jones and Jonesworks blithely surrendered the entire contents of Abel's iPhone communications for a second time, creating a veneer of legitimacy and affording Jones and Jonesworks plausible deniability once the New York Times came through for Lively. It is on this pretext that Jones' and Jonesworks' counsel later described responding to a "court-ordered subpoena." *See* Tatiana Siegel et al., "How Did Blake Lively's Lawyers Obtain Bombshell Texts from Justin Baldoni's PR Team," Variety (Dec. 23, 2024), https://variety.com/2024/film/news/blake-lively-justin-baldoni-bombshell-text-messages-subpoena-1236258665/.

101.    As a result of Jones' malicious scheme, Abel's life has been turned upside down. Her career and reputation have been destroyed, her private information leaked, and her email inbox and social media pages filled with a daily stream of death threats and abuse.

102.    The backlash against Wayfarer and Baldoni has been equally devastating, with Baldoni wrongfully labeled as a sex pest, his accolades rescinded, and his future projects thrown into doubt.

103.    In an unimaginable invasion of Abel's privacy and dignity, Jones and the Lively Parties now possess the full contents of Abel's iCloud and email accounts, including her photos, text messages, and emails. Abel lives in fear of what is to come, given the vast troves of personal data in the possession of these hostile actors.

104.    As a result of Jones' and Jonesworks' tortious conduct, Abel has suffered enormous

harm to her personal and professional life. All of this harm has accrued in the State of California, where Abel lives and works.

## FIRST CAUSE OF ACTION

### (Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq.)

### *Against Jones and Jonesworks*

105.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

106.    The Computer Fraud and Abuse Act ("CFAA"), enacted in 1986 as part of the ECPA, prohibits the intentional accessing, without authorization or in excess of authorization, of a computer under certain circumstances. 18 U.S.C. § 1030(a).

107.    The CFAA reflects Congress's judgment that users have a legitimate interest in the confidentiality and privacy of information within their computers.

108.    The CFAA provides that it is unlawful to "intentionally access a computer without authorization or exceed[] authorized access, and thereby obtain[] . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(c).

109.    Further, the CFAA mandates that it is unlawful to "knowingly and with intent to defraud, access[] a protected computer without authorization or exceed[ing] authorized access" and thereby "further[] the intended fraud and obtain[] anything of value" 18 U.S.C. § 1030(e)(12).

110.    A "computer" is defined as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." 18 U.S.C. § 1030(e)(10).

111.    "Exceeds authorized access" is defined as "to access a computer with authorization

and to use such access to obtain or alter information in the computer that the accessor is not entitled to so obtain." 18 U.S.C. § 1030(e)(6).

112.    A "protected computer" is defined as "a computer . . . which is used in or affecting interstate or foreign commerce or communication . . . , [or that] has moved in or otherwise affects interstate or foreign commerce." 18 U.S.C. § 1030(e)(2)(B).

113.    Abel's private data, including her text messages and emails, was stored and hosted on remote servers located around the country and owned and operated by third parties, including Apple and Google. These servers constitute "protected computers" under the CFAA. 18 U.S.C. § 1030(e)(2)(b).

114.    As alleged, Jones and Jonesworks intentionally accessed these protected computers knowingly and without authorization or consent, or in a manner that exceeded their authorization, accessed Abel's cloud-based accounts hosted on protected computers and obtained Abel's private data therefrom in violation of the CFAA. 18 U.S.C. § 1030(a)(2)(C).

115.    Jones and Jonesworks' conduct constitutes a knowing intent to defraud Abel and her personal data and thereby derive financial gain. 18 U.S.C. § 1030(a)(4).

116.    Abel has suffered harm and injury due to Jones' and Jonesworks' unauthorized access to the communications containing her private and personal information.

117.    A civil action for violation of the CFAA is proper if the conduct involves "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I). The loss to Abel during a one-year period within the relevant timeframe, including the loss of her privacy and reputational interest in and control over her personal data, the expenditure of funds to regain control over her accounts, and legal expenses arising directly from the CFAA violation, exceeded $5,000 in aggregate. As a result, Abel is entitled to bring this civil

action and is entitled to economic damages, compensatory damages, injunctive, equitable, and all available statutory relief, as well as her reasonable attorneys' fees and costs and other relief as permitted by the CFAA. 18 U.S.C. § 1030(g).

## SECOND CAUSE OF ACTION

**(Violations of Stored Communications Act, 18 U.S.C. § 2701, et seq.)**

**Against Jones and Jonesworks**

118.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

119.    The Stored Communications Act ("SCA"), enacted in 1986 as part of the Electronic Communications Privacy Act of 1986 ("ECPA"), creates a civil remedy against any person who "intentionally accesses without authorization" or "intentionally exceeds an authorization to access" a facility through which an electronic communication service ("ECS") is provided. 18 U.S.C. §§ 2701, 2707.

120.    The SCA reflects Congress's judgment that users have a legitimate interest in the confidentiality and privacy of communications in electronic storage and confers a private right of action for individuals who have been harmed by knowing or intentional conduct that is in violation of the SCA. 18 U.S.C. § 2707(a).

121.    The SCA defines "electronic communication" as "any transfer of signs, signals, . . . data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

122.    "Electronic storage" is defined as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any

storage of such communication by an electronic communication service for purposes of backup protection of such communication . . . ." 18 U.S.C. §§ 2510(17) (incorporated by reference in 18 U.S.C. § 2711(1)).

123.    Abel, as an individual, Jones, as an individual, and Jonesworks, as a legal entity, are "persons" within the meaning of 18 U.S.C. § 2510(6), and for purposes of 18 U.S.C. § 2707.

124.    The data transmitted to and from Abel's email accounts and iCloud, including her emails and text messages, constitute "electronic communications" within the meaning of the SCA. 18 U.S.C. § 2510(12).

125.    As alleged above, Jones and Jonesworks have unlawfully and without authorization accessed, collected, analyzed, derived financial benefit from, disclosed, and disseminated Abel's personal data.

126.    Without her knowledge or consent, Abel's data was intentionally intercepted by Jones and Jonesworks.

127.    Without her knowledge or consent, Abel's data was intentionally accessed and obtained by Jones and Jonesworks.

128.    As detailed herein, Abel was not aware of and did not consent to Jones' and Jonesworks' obtaining access to and intercepting, disclosing, and disseminating her electronic communications.

129.    Jones and Jonesworks violated the SCA, 18 U.S.C. § 2701, by willfully and intentionally accessing Abel's private communications and data stored in servers and other electronic facilities without authorization or in excess of authorization.

130.    As a result of Jones' and Jonesworks' conduct, Abel is entitled to all relief set forth in 18 U.S.C. § 2707, including declaratory and equitable relief, compensatory damages measured

by actual damages and Jones' and Jonesworks' profits, reasonable attorneys' fees and costs, all available statutory relief, and punitive damages.

### THIRD CAUSE OF ACTION

#### (Violations of the Federal Wiretap Act, 18 U.S.C. § 2510, et seq.)

#### Against Jones and Jonesworks

131.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

132.    The Federal Wiretap Act ("FWA"), as amended by the ECPA, prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication.

133.    Under the FWA, no person may intentionally intercept, endeavor to intercept, or procure "any wire, oral, or electronic communications." 18 U.S.C. § 2511(1)(a). Similarly, it is unlawful for any person to intentionally disclose, or endeavor to disclose, to any other person or to intentionally use, or endeavor to use, the "contents of any wire, oral, or electronic communication, knowing or having reason to know" that the communication was obtained in violation of the FWA. 18 U.S.C. § 2511(1)(c) & (d).

134.    The FWA confers a private right of action for any person whose wire, oral, or electronic communication is intercepted, used, or disclosed in violation of the FWA. 18 U.S.C. § 2520(a).

135.    The FWA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic device, mechanical, or other device." 18 U.S.C. § 2510(4).

136.    The FWA defines "electronic communication" as "any transfer of signs, signals, . . . data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic,

photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

137.    The FWA defines "electronic, mechanical, or other device" as "any device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

138.    The FWA defines "contents," with respect to any covered communication, to include "any information concerning the substances, purport, or meaning or that communication." 18 U.S.C. § 2510(8).

139.    The FWA defines "person" to include "any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

140.    Jones and Jonesworks are each a person as defined in 18 U.S.C. § 2510(6).

141.    The data and transmissions within, to, and from Abel's mobile device, email accounts, and iCloud account, including her text messages, constitute "electronic communications," as defined by 18 U.S.C. § 2510(12), because they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic, or photooptical systems that affect interstate commerce.

142.    As alleged above, Jones and Jonesworks intercepted, in real time, contemporaneously, and as it was transmitted, the contents of electronic communications transmitted within, to, and from Abel's mobile device, email accounts, and iCloud, including her text messages, and diverted those communications to Jones and Jonesworks.

143.    As detailed herein, Abel was not aware of and did not consent to Jones' and Jonesworks' interception of her electronic communications.

144.    Abel had a reasonable expectation that, after her termination from Jonesworks,

Jones and Jonesworks would not surreptitiously intercept and divert the electronic communications described above.

145.    In a further violation of the FWA, Jones and Jonesworks have intentionally used or endeavored to use the contents of the electronic communications described above, knowing or having reason to know that the information was obtained through interception in violation of 18 U.S.C. § 2511(1)(a). *See* 18 U.S.C. § 2511(1)(d).

146.    Jones and Jonesworks have used the illicitly obtained contents of these electronic communications to, *inter alia*, (1) monitor Abel's activities after her termination from Jonesworks; (2) spy on her conversations with third parties, including Wayfarer and Baldoni; (3) interfere with Abel's nascent small business and gain a competitive advantage in relation thereto; (4) harm Abel's career and reputation; (5) cause Abel mental and emotional distress; and (6) share them with hostile third parties, including Lively, Reynolds, Sloane, and their affiliated entities.

147.    Consequently, Abel has suffered harm and injury due to the interception, disclosures, and/or use of electronic communications containing her and others' private information.

148.    Under 18 U.S.C. § 2520, Abel has been damaged by the interception, disclosure, and/or use of her communications in violation of the FWA and is entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Abel and any profits made by Jones and Jonesworks as a result of these violations or (b) statutory damages for Abel of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

149.    Abel seeks compensatory, injunctive, and equitable relief in an amount to be

determined at trial, including an award of reasonable attorneys' fees and costs and punitive or exemplary damages for Jones' and Jonesworks' willful violations.

## FOURTH CAUSE OF ACTION

### (Violations of California Penal Code § 502)

#### *Against Jones and Jonesworks*

150.   Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

151.   Jones and Jonesworks violated the provisions of California Penal Code § 502(c) by doing the following acts:

   a.  Knowingly accessing and without permission obtaining, altering, disseminating, or otherwise using Abel's data, computer, computer system, and computer network in order to devise and execute a scheme and artifice to defraud and deceive and wrongfully control and obtain property and data.

   b.  Knowingly and without permission accessing and causing to be accessed, taking and causing to be taken, copying and causing to be copied, using and causing to be used computer services, namely Abel's personal Gmail account, the email account maintained by Abel's business, RWA Communications, and Abel's iCloud data, including her text messages.

152.   As a direct and proximate result of Jones' and Jonesworks' acts in violation of California Penal Code § 502(c), Abel has suffered damages in an amount to be proven at trial.

153.   In doing the acts herein alleged, Jones and Jonesworks acted with oppression, fraud, malice, and in conscious disregard of Abel's rights, and Abel is therefore entitled to punitive and exemplary damages.

154.    In violation of California Penal Code §502(c), Jones and Jonesworks became liable to Abel for her attorneys' fees and costs.

### FIFTH CAUSE OF ACTION

**(Invasion of Privacy)**

***Against Jonesworks and Jones***

155.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

156.    Abel has a legally protected privacy interest in her private communications, personal data, financial information, personal photos, and other private data.

157.    Jones and Jonesworks intentionally invaded Abel's privacy by, among other things: (a) hacking into Abel's personal and business emails and text messages in order to secure information for use in legal proceedings against her; (b) without authorization accessing, copying, disseminating, using, and publicly disclosing, including to Abel's former coworkers, the Lively Parties, and the New York Times, private information obtained from Abel's personal and business email accounts and text messages; and (c) intruding upon the seclusion and private affairs of Abel by accessing Abel's computer, computer system, computer network, and computer services, including her email and iCloud accounts, and the personal information contained therein, in a manner highly offensive to a reasonable person.

158.    Jones and Jonesworks knew or should have known that Abel had a reasonable expectation of privacy that her communications and personal data would remain private and not be accessed, copied, disseminated, or publicized to Jonesworks employees, the Lively Parties, and other third parties.

159.    The facts disclosed about Abel were private facts that Abel desired at all times to

keep private.

160.    Abel did not consent to such acts or authorize the intrusion by Jones and Jonesworks.

161.    Jones' and Jonesworks' invasion of Abel's privacy and dissemination and use of her confidential and private emails and text messages constitute a serious invasion of Abel's privacy interests and were highly offensive and objectionable to Abel and a reasonable person of ordinary sensibilities.

162.    As a direct and proximate result of the above-described wrongful conduct by Jones and Jonesworks, Abel has suffered damages in an amount to be proven at trial.

163.    Upon information and belief, Jones and Jonesworks were aware that the other planned to commit the torts of intrusion upon seclusion and public disclosure of private facts against Abel and otherwise invade Abel's privacy and agreed with one another and intended that the wrongful acts pleaded herein be committed. Accordingly, Jones and Jonesworks are equally liable to Abel for the torts by reason of their conspiracy.

164.    Jones and Jonesworks engaged in the above-alleged conduct with oppression, fraud, and malice. Accordingly, Abel is entitled to an award of punitive and exemplary damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### (False Light)

### *Against Jonesworks and Jones*

165.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

166.    As alleged herein, Jones and Jonesworks publicly disclosed information or material

regarding Abel's moral character and personal and professional life which showed Abel in a false light.

167.    The false light created by these disclosures was highly offensive and objectionable to a reasonable person in Abel's position in that it made Abel an object of scorn, pity, ridicule, humiliation, and other suffering.

168.    Jones and Jonesworks knew the public disclosure would create a false impression about Abel or acted with reckless disregard for the truth.

169.    As a direct and proximate result of the said publicity and false and misleading disclosures, Abel sustained harm to her business and personal and professional reputation.

170.    Abel has also suffered and continues to suffer from grief and anxiety as a result of the wanton destruction of her public reputation and character.

171.    As a further direct and proximate result of the above-described disclosures, Abel has suffered a loss of income and interference with future income.

172.    The conduct of Jones and Jonesworks described herein was a substantial factor in causing Abel's harm, constituted a serious invasion of her right to privacy, and was an egregious breach of social norms that shocks the conscience.

173.    Upon information and belief, Jones and Jonesworks were aware that the other planned to commit the tort of false light against Abel and agreed with one another and intended that the wrongful acts pleaded herein be committed. Accordingly, Jones and Jonesworks are equally liable to Abel for the tort of false light invasion of privacy by reason of their conspiracy to commit the tort.

174.    Jones and Jonesworks engaged in the above-alleged conduct with oppression, fraud, and malice. Accordingly, Abel is entitled to an award of punitive and exemplary damages

68

in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### (Conversion)

### *Against Jones and Jonesworks*

175.     Plaintiff hereby incorporates each and every allegation set forth above as if set forth fully herein.

176.     Abel owns and/or has a possessory interest in the phone number (904) 742-2954. When she joined Jonesworks in 2020, she had owned, controlled, and used the phone number for approximately 20 years. She agreed to port it to Jonesworks' phone plan with the express understanding that she would retain ownership of it and that it would revert back to her upon her departure.

177.     Upon Abel's termination from Jonesworks, Jones and Jonesworks substantially interfered with Abel's ownership and/or possessory interest in the phone number by knowingly or intentionally taking possession of it and refusing to release it to Abel after she demanded its return.

178.     Abel did not consent to Jones' and Jonesworks' conversion of the phone number and suffered harm, which Jones' and Jonesworks' conduct was a substantial factor in causing.

179.     As a direct and proximate result of said conduct by Jones and Jonesworks, Abel has suffered damages in an amount to be proven at trial.

180.     Jones and Jonesworks engaged in the above-alleged conduct with oppression, fraud, and malice. Accordingly, Abel is entitled to an award of punitive and exemplary damages in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

### *Against Jonesworks and Jones*

181.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

182.    The misconduct of Jones and Jonesworks and its officers, directors, employees, and agents described herein was outrageous and extreme and transcended the bounds of human decency.

183.    Jones and Jonesworks and its officers, directors, employees, and agents intended to cause Abel emotional distress or acted with reckless disregard for the probability of causing her emotional distress.

184.    Abel suffered severe or extreme emotional distress and mental anguish as a result of the above-described conduct of Jones and Jonesworks and its officers, directors, employees, and agents.

185.    The outrageous conduct of Jones and Jonesworks and its officers, directors, employees, and agents was a substantial factor in causing Abel's severe emotional distress and was the direct proximate cause of the emotional distress.

186.    Upon information and belief, Jones and Jonesworks were aware that the other planned to commit the tort of intentional infliction of emotional distress against Abel and agreed with one another and intended that the wrongful acts pleaded herein be committed. Accordingly, Jones and Jonesworks are equally liable to Abel for the tort of intentional infliction of emotional distress by reason of their conspiracy to commit the tort.

187.    Jones and Jonesworks engaged in the above-alleged conduct with oppression,

fraud, and malice. Accordingly, Abel is entitled to an award of punitive and exemplary damages in an amount to be proven at trial.

## NINTH CAUSE OF ACTION

### (Negligent Infliction of Emotional Distress)

### *Against Jonesworks and Jones*

188.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

189.    The misconduct of Jones and Jonesworks and its officers, directors, employees, and agents described herein was outrageous and extreme and transcended the bounds of human decency.

190.    Jones and Jonesworks and its officers, directors, employees, and agents intended to cause Abel emotional distress or acted with reckless disregard for the probability of causing her emotional distress.

191.    As an employee under their supervision, Abel was owed a duty of care by Jones and Jonesworks.

192.    At all times relevant, it was reasonably foreseeable that Abel would suffer harm if Jones and Jonesworks engaged in the above-described conduct.

193.    Jones and Jonesworks breached their duty of care to Abel and affirmatively contributed to and caused Abel's injuries.

194.    These breaches constitute negligence on the part of Jones and Jonesworks.

195.    Abel suffered severe or extreme emotional distress and mental anguish as a result of Jones' and Jonesworks' negligent conduct.

196.    The negligence of Jones and Jonesworks was at least a substantial factor in causing

Abel's severe or extreme emotional distress and mental anguish.

197.    As a direct and proximate result of the above-described conduct, Abel was harmed.

## TENTH CAUSE OF ACTION

**(Promissory Fraud)**

***Against Jonesworks and Jones***

198.    Abel hereby incorporates each and every allegation set forth above as if set forth fully herein.

199.    On August 21, 2024, Jonesworks, through its agent Gordon Duren and its attorney and at Jones' direction, promised Abel that if she gave up her Jonesworks-issued iPhone and provided her passcode, Jonesworks would release her number and ensure she had exclusive access to the private data stored on and the accounts accessible from the iPhone.

200.    Abel reasonably relied on the promise made by Jonesworks.

201.    However, Jonesworks never intended to perform the promise when it was made. Instead, Jonesworks, through its agent and attorney, intended to—and did—dupe Abel into giving up the iPhone and passcode so as to access, copy, and disseminate without authorization the private data stored on the device and information from accounts accessible from the device. Jonesworks also intended to—and did—retain possession of Abel's phone number to cause chaos in her life (which it did).

202.    Jonesworks did not perform in accordance with its promise.

203.    As a direct and proximate result of the above-described conduct, Abel was harmed.

204.    Abel's reliance on Jonesworks' promise was a substantial factor in causing her harm.

205.    Upon information and belief, Jones and Jonesworks were aware that the other

planned to commit the tort of promissory fraud against Abel and agreed with one another and intended that the wrongful acts pleaded herein be committed. Accordingly, Jones and Jonesworks are equally liable to Abel for the tort of promissory fraud by reason of their conspiracy to commit the tort.

206.    Jones and Jonesworks engaged in the above-alleged conduct with oppression, fraud, and malice. Accordingly, Abel is entitled to an award of punitive and exemplary damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimant Jennifer Abel prays for the following relief:

1.    For monetary damages in an amount according to proof;

2.    For civil penalties pursuant to statute;

3.    For pre- and post-judgment interest;

4.    For punitive and exemplary damages according to proof;

5.    For attorneys' fees and costs incurred by Abel, as applicable; and

6.    For such other legal and equitable relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Abel demands a jury trial on all causes of action so triable.

Respectfully submitted,

**MEISTER SEELIG & FEIN PLLC**

Dated:  April 24, 2025
        New York, NY

By:     _/s/ Mitchell Schuster_
        Mitchell Schuster
        Kevin Fritz
        125 Park Avenue, 7th Floor
        New York, NY 10017
        Tel: (212) 655-3500

73

Email: ms@msf-law.com
            kaf@msf-law.com


Dated:  April 24, 2025                     **LINER FREEDMAN TAITELMAN +**
            Los Angeles, CA                    **COOLEY, LLP**


                                           By:_____*/s/ Bryan Freedman*_____
                                                   Bryan J. Freedman (*pro hac vice*)
                                                   Miles M. Cooley (*pro hac vice*)
                                                   Theresa M Troupson (*pro hac vice*)
                                                   Summer Benson (*pro hac vice*)
                                                   Jason Sunshine
                                           1801 Century Park West, 5th Floor
                                           Los Angeles, CA 90067
                                           Tel: (310) 201-0005
                                           Email: bfreedman@lftcllp.com
                                                   mcooley@lftcllp.com
                                                   ttroupson@lftcllp.com
                                                   sbenson@lftcllp.com
                                                   jsunshine@lftcllp.com

                                           *Attorneys for Defendant and Counterclaimant*

74